PRICE v. WALLACE.

(District Court, D. Oregon. July 6, 1915.)

No. 6511.

1. SPECIFIC PERFORMANCE ⊜⇒86, 121—PAROL CONTRACT TO MAKE WILLS—EN·
FORCEMENT—EVIDENCE.

A parol agreement to make a will, if legally enforceable, will not be
enforced, unless the evidence shows a reasonably definite and certain
contract, established by clear, full, and irrefragable evidence, and per-
formed to such an extent and in such manner that the beneficiary cannot
be properly compensated in damages.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§
223, 224, 387–395; Dec. Dig. ⊜⇒86, 121.]

2. WILLS ⊜⇒58—CONTRACT TO MAKE WILLS—EVIDENCE—SUFFICIENCY.

Evidence held not to establish a contract to make a will by one in
favor of his stepdaughter and her children.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 164, 165; Dec.
Dig. ⊜⇒58.]

3. TRUSTS ⊜⇒44—PAROL TRUSTS—EVIDENCE—SUFFICIENCY.

Evidence held not to establish a trust, binding the widow of testator
to hold a part of testator's property in trust for testator's stepdaughter
and her children.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 66–68; Dec.
Dig. ⊜⇒44.]

In Equity. Suit by Elizabeth M. Price against Marie Dewey Wal-
lace. Decree of dismissal.

Peter B. Smith was, on July 12, 1893, married to Mrs. Lillie D. Ailes; she
having been divorced from a former husband. The plaintiff is the daughter of
Mrs. Ailes, and was at the time about the age of 14 years. Plaintiff lived
with her mother and stepfather until her marriage with Donald MacLean,
February 20, 1899. This marriage took place in London, England; the plain-
tiff having gone abroad on a trip with her own father, Lyman Ailes, and at
his expense. MacLean was a surgeon in the United States Army. The issue
of the marriage was two sons. Mrs. Smith died June 12, 1900. At that time
the plaintiff and her husband, MacLean, came to live with Smith. MacLean
continued the relations for a short time only, when he left, and plaintiff and
her sons continued to live with Smith until he was married to the defendant,
and for a time thereafter. This marriage was consummated May 14, 1902,
at Fargo, N. D. On the day of his marriage to defendant, Smith made and
published his last will and testament, whereby he made provision for plaintiff
in the sum of $5,000, referring to her as his adopted daughter, and for her
children in the further sum of $5,000, constituting plaintiff and his wife trus-
tees to dispense the fund for their use and benefit. The wife was handed a
copy of this will on the day of the marriage and shortly thereafter.

The plaintiff was divorced from MacLean January 9, 1902, the suit therefor
having been instituted in the fall of 1901. In August, 1905, at San Jose, Cal.,
plaintiff was married to Edwin J. Price, who died March 3, 1914. Soon after
the marriage Price legally adopted the two sons of plaintiff. From the time
of the marriage plaintiff continued to make her home in California with her
children, until after the death of Peter B. Smith, which occurred August 16,
1907, when she moved again to Minneapolis, and was a resident of Minnesota
at the time of the commencement of this suit. Prior to Smith's decease, to
wit, on January 10, 1906, he made and published a second will, revoking all
former wills, wherein and whereby he made no mention of plaintiff and her
two sons, and gave his entire estate to his wife, the defendant herein, naming
her as his sole executrix. This will was caused to be probated by the defend-

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ant about August 27, 1907, and the estate was subsequently in due course settled, and the executrix discharged; the plaintiff making no claim in probate against the estate for any share thereof.

On August 14, 1908, the plaintiff instituted a suit against the defendant, in the district court within and for the county of Hennepin, state of Minnesota; the cause being stated in all material respects the same as in the present suit, and demanding like relief. To the bill of complaint the defendant interposed a demurrer, assigning the following reasons: "(1) That this court has no jurisdiction of the subject of the action. (2) That the plaintiff has not legal capacity to sue. (3) That there is a defect of parties plaintiff, in that Donald Mac-Lean should be made a party plaintiff therein. (4) That the facts stated in said complaint do not constitute a cause of action." After full argument and hearing upon the demurrer, and due consideration, it was ordered by the court "that the said demurrer be and the same is hereby in all things sustained." Later, and in due course, it was further adjudged that the defendant recover from the plaintiff the sum of $7.50 costs and disbursements as taxed and allowed.

Now, as cause of suit, briefly stated, the plaintiff alleges that about the month of October, 1900, both before and after the departure of MacLean, Smith offered and proposed to complainant, and upon her assent agreed with her, that if she would make her home with him, and live there as his daughter, and treat and regard him as her own father, and care for him during his declining years, and assume the cares, duties, and responsibilities of the management of his household, and be the housekeeper thereof in the same manner and to the same extent as though she were his own daughter, he, the said Peter B. Smith, would care for and support the complainant and her children in the same manner as if she were his own daughter and the said children his grandchildren, and would at his death leave and will to complainant, for herself and her children, all the property that he might then own, and that complainant assented to and accepted said proposal and agreed thereto. It is further alleged that plaintiff entered upon and discharged the obligations on her part in every respect until about the month of February, 1902, when the agreement was modified. It is then further alleged that, about the month of February, 1902, Peter B. Smith, being about to contract marriage with the defendant, requested the complainant to consent that said promise and obligation, as by the terms of said agreement undertaken upon his part, be modified so as to require him (Smith) to leave and bequeath to complainant, for herself and her two children, two-thirds of the property that he might own at the time of his death—one-third for her own separate use and benefit and one-third for the use and benefit of her children—and to permit him to bequeath one-third of his estate to the defendant, to all of which the plaintiff assented, and thus by mutual consent of the parties the agreement was accordingly modified. Plaintiff thereupon asserts that she performed upon her part all the conditions of the agreement as so modified, so far as she was permitted so to perform by the said Peter B. Smith. It is then further alleged that, shortly after the probate of Smith's will, the plaintiff advised the defendant of the agreement and modified agreement existing between plaintiff and Smith at the time of his death, and that defendant then informed plaintiff that it had been understood and agreed between defendant and Smith that Smith should leave by will all of his property to the defendant, but that defendant should take and hold two-thirds of the same in trust for the use and benefit of the complainant and her two children, and that defendant should account to complainant for two-thirds of said property, and that defendant then and there promised and agreed with plaintiff that she would respect, recognize, and protect complainant's said rights and interests, and would take all the property of said estate in her own name as sole legatee and distributor thereof, but that she would so take and hold two-thirds of said property in trust, and charged and impressed with a trust in favor of complainant and her children, and would faithfully render account accordingly. The estate is a large one, and it is charged that defendant has refused to observe the obligations of the trust, although due demand has been made upon her in that behalf. The prayer demands that defendant be charged as trustee of two-thirds of the

estate for the use of plaintiff and her sons, and that she render an account, and such other and further relief as may seem equitable.

Wm. H. Hallam, of Portland, Or., for complainant.

H. V. Mercer, of Minneapolis, Minn., and Wood, Montague & Hunt, of Portland, Or., for defendant.

WOLVERTON, District Judge (after stating the facts as above). It is first urged that the suit and decree following upon the demurrer in the state court in Minnesota is a bar to the present suit. While I am strongly persuaded that the contention is sound (Lindsley v. Union Silver Star Min. Co., 115 Fed. 46, 52 C. C. A. 640), I am disposed to waive the question and determine the cause solely upon the merits of the controversy. It should be further premised that this is not a suit to disclose an adoption on the part of Peter B. Smith of the plaintiff as his child, and thus to establish her right to a child's portion of his estate as an heir by inheritance, but its theory and purpose is to specifically enforce an agreement to make a will in favor of plaintiff, as subsequently modified, and to declare a trust, with defendant, as trustee, obligated to account to the plaintiff for her use and the use of her two sons to the extent of two-thirds of the estate of decedent. To the issues thus cast in the record we must be confined, and we can determine none other.

[1] Another factor in the inquiry is that the alleged agreement to make a will, and the modification thereof, sought to be enforced, are in parol, and their sufficiency on this account is questioned. I need not stop to inquire as to this. It may be conceded, without inquiring, but without deciding, that such and kindred agreements in parol are legally sufficient to justify their enforcement, but with the qualifications, first, that they must be reasonably definite and certain; second, they must be established by clear, full, and irrefragable evidence; and, third, they must have been performed to such an extent and in such a manner that the beneficiary cannot be properly compensated in damages. Stellmacher v. Bruder et al., 89 Minn. 507, 95 N. W. 324, 99 Am. St. Rep. 609; Richardson v. Richardson, 114 Minn. 12, 130 N. W. 4; Haubrich v. Haubrich, 118 Minn. 394, 136 N. W. 1025; Robertson v. Corcoran, 125 Minn. 118, 145 N. W. 812. As to whether the trust agreement is also required to be in writing, I waive that as well.

[2] When Peter B. Smith married Mrs. Ailes, the plaintiff, being her daughter, became a member of his household, as she naturally would. Smith regarded her as a member of his family. He was fond of her, treated her with parental regard, and cared for her very much, I assume, as he would have cared for his own child. He called her "Bess," as her mother and associates did, and allowed her to take his name, that of Smith, by which she seems generally to have been known. But when she went abroad with her father she resumed the name of Ailes, and traveled with him under that name. It was on this trip that she was married to Donald MacLean, in London. She was then about the age of 20 years, and says she obtained the consent of her mother and stepfather to the marriage. She returned with her husband soon to the United States and accompanied him as he was transferred from

post to post, but later returned with him to the home of Smith in Minneapolis. The plaintiff affirms that Smith had previously urged her husband to resign from the army, and that he came to Minneapolis, so that he might engage in private practice at that place. The immediate cause, however, for their coming to Minneapolis was the illness of plaintiff's mother, and before coming MacLean resigned from the army. After the death of her mother, which occurred on June 12, 1900, the day of her arrival in Minneapolis, it was arranged that plaintiff and her husband should live with Smith, that plaintiff should keep house for him, and that her husband should engage in the practice of medicine. This arrangement continued until October of that year, when trouble arose, which resulted in Dr. MacLean leaving, not only the home of Smith, but the city of Minneapolis, and thence continuing absent therefrom. Plaintiff asserts that her stepfather would not allow her, with her child, to go with her husband. From that time on the plaintiff remained, with her child and one subsequently born, with her stepfather until after his marriage with the present defendant. After Dr. MacLean had left, plaintiff relates that her stepfather insisted on her remaining with him as his daughter and keeping house for him, and that he said to her that she ought to be glad that she was "rid of a man like that," and that he would never be able to take care of the baby and herself as he should do, and that "the sooner I would consent to leave the doctor"—using the language of plaintiff as a witness in her own behalf—"divorce him, make up my mind to give him up entirely, the better it would be for all of us; * * * and he said that if I would give him up entirely, everything he had would be mine when he had gone." To this she relates she did not then assent. She further relates that she frequently had conversations with her stepfather along the same line, and, specifying more particularly, she says:

"Well, my dad was disappointed that I still had any thought whatever of going back to the doctor, and in the mornings almost the first thing he would say, he would come in the dining room to the table, and he would say, 'Well, Bess, are you going to give up this man?' I would say, 'No.' And that would perhaps drop then. Or he would say another time. 'Have you come to your senses yet?' He was just continually banging away at me all the time, and saying continually that when I would give up this man, who had proven himself no good, and in no position to take care of the baby and me, everything that he had would be ours. He repeated that over and over and over all during this time. * * * That continued until that fall. I would not consent to give up all thought of the doctor. * * * I meant to say that it continued all that winter, until the following spring. And finally—my health was very, very poor, and finally—I think it was in the last of April or the first part of May (this is 1901), I couldn't stand it any longer; I was very miserable and unhealthy; and I said to Dad, 'All right, go ahead and get the divorce.' He did. And then I accepted. Then is when I accepted that I would stay, gave up all thought of going to the doctor, decided that I would stay and make my home the rest of my life, as I thought, there in my home."

Until the time she consented to procure a divorce, she contemplated, when opportunity presented itself, renewing her marriage relations with her husband. On cross-examination touching the same subject, the plaintiff continues:

"Q. You say in your complaint, in effect, that Mr. Smith told you that if you went with Dr. MacLean he would not contribute anything to your sup-

port; that is, Mr. Smith would not contribute anything to your support. Is that right? A. Yes. Q. If I understood you correctly awhile ago, in your testimony, you said in effect that Mr. Smith told you that, if you stayed there, he would do something by you in a property way? A. Yes; if I would divorce the doctor. Q. Did he only say that in connection with his statement that if you would divorce the doctor he would do it? A. I wouldn't say that he used those very words invariably. He would change his way of speaking by saying, 'Well, have you come to your senses, and will give up this man—make up your mind to give him up?' He didn't always use the word 'divorce.' Q. Well, was all of this talk, which you say took place between you and Mr. Smith about what he would do if you did give him up, had before the time when you filed your divorce complaint? A. Not all the talk before. There was talk before I consented to divorce the doctor. Q. Well, was there any talk, about the property arrangement which you have mentioned, after the time when you filed 'your divorce action, and before the time when you say he announced his engagement to you? A. Well, that was a thing that was more taken for granted; that he had changed very much since I consented to divorce the doctor. He asked if there was anything that he could do. He did everything in his power for me. And when I accepted the conditions, I understood that meant that when I gave up the doctor I should have everything. Q. Well, now, the time when you say you accepted was before you filed the divorce action? A. Yes; at the same time. Q. And if you made any acceptance, then, of what you say was his proposition, it was before you started the divorce action? A. Well, I think that when I started the divorce action was the same time that I accepted this proposition. Q. You don't think it was after that that you accepted it? A. I should think that the matter of accepting, of divorcing the doctor would be accepted, I should think it would be the same time. * * * Q. Now, how did he put that proposition? I would like to have the exact words, if you can give them. A. I will give the exact words, just as nearly as I can: 'If you will give up this man, I will leave everything I have to you when I am gone.' I think those are very close to the exact words."

Further on she continues:

"Q. Now, the matter of divorcing the doctor was the matter that you and Mr. Smith had talked about at various times, wasn't it? A. Various times. Q. And that came about in the inception because the doctor was not able to support you at that time, didn't it? A. As a general thing. * * * Q. And Mr. Smith advised you that, until the doctor could earn something to support you, you had better stay there and live with him, didn't he? A. No; he didn't put it that way. He forbade me to go, Mr. Mercer. Q. But, as a matter of fact, Mr. Smith told you then, didn't he, that if the doctor got himself established some place you could go to him? A. Why, yes; he told me that, I presume, in a way to quiet me. Q. And he told you that a good many times, didn't he, afterwards? A. Yes; but he said, also, that he never expected that he would. Q. Yes; but that if he did, you could go? A. Yes. Q. And he kept that up as long as you didn't apply for the divorce, didn't he? A. Oh, no; he insisted upon my getting a divorce. Almost continuously he was grinding that—that I must divorce the doctor."

And again:

"Now, you never told Mr. Smith at any time until you decided to get a divorce that you would accept any suggestion that he had made, did you, about this matter? A. I don't think so—speaking always of the idea that I would divorce the doctor. * * * Q. Do you remember the conversation that took place when you told Mr. Smith that you had decided to get the divorce? Now, I want exactly the language, if you can give it. A. I told you I couldn't, Mr. Mercer. Q. Then I want the substance of it, as to what you said and what he said, if you please. A. Well, the substance of it, and the most important part to my mind, is my saying—I just gave up and said, 'All right, Dad, go ahead and get the divorce.' Q. That is all you said? A. I don't say that is all I said. I said that was the important thing.

* * * Q. Up to that time, Mr. Smith had never mentioned the word 'will' to you, had he? A. Well, he may have mentioned the word 'will.' Q. Not in relation to his affairs and yours, did he, the word 'will'? A. I don't think he ever—I don't know, but I don't recollect the word 'will' exactly. Q. Now, you hadn't mentioned the matter of his will to him, had you, in the terms of 'will'? A. I don't think so. Q. As a matter of fact, you never had discussed with Mr. Smith the question of how he would leave his property, had you, in so many words? A. Only what he had said, that he would leave it all to me. Q. Did he say when he would leave it to you? A. When he was gone. Q. Did he say he would leave it by will? A. He didn't say 'will' that I remember. * * * Q. As a matter of fact, the question of his making a will, where the term 'will' was used, was never mentioned between you and Mr. Smith at any time, was it? A. Well, it seems to me that on one occasion, * * * when Dad was making the remark, and insisting that I consent to divorcing the doctor, he made the remark—I can't swear just how this was—that he made the remark that he wished I would make up my mind, so that he could—I don't know whether he used the word 'will' or not—I can't answer that. Q. Now, he never said anything to you, after he was married to the defendant, about leaving you any property? A. No; I don't think the question ever came up."

It will be remembered that divorce proceedings were commenced in the fall of 1901, and a divorce was obtained January 9, 1902.

As to the second alleged agreement, in modification of the first, the testimony is very brief. The next morning after Smith and the defendant had become engaged to marry, plaintiff relates that her stepfather advised her of what had happened, and after saying to her that he did not want her to think that any one could ever take her mother's place, and indicating that the new relations would make some difference to her, he said:

"Instead of you having everything I have when I am gone, you will have one-third, and the boys will have one-third, and Dewey (meaning the defendant) will have one-third; but," he said (quoting the further language of witness), "I think we will have enough for all." "That," she says, "was practically all that was said, because it was rather a tense situation." "And I said, 'All right.'"

As it pertains to the alleged trust relations on the part of the defendant, the plaintiff testifies that, shortly after her stepfather's death, she, with her husband, Price, went to Minneapolis, and while there had a conversation with defendant about Smith's disposition of his property. She says:

"I told her that I had seen the will, and that I was very much surprised that there had been no provision made for me and the children, and further went on to say that I could not understand it—that I couldn't understand why there was no provision made for myself and the children. And Dewey said, 'Yes,' she was surprised also, and that she knew nothing about it; * * * that she was also surprised; that she knew nothing whatever about the will. But she said she supposed that it had been made that way—it was very short and very brief—for business reasons; and she said she knew I was anxious to get back to the children in California, or else she said she supposed I was anxious—anyhow, that remark came up—and that she knew the agreement, and that I could go back to California and not wait for the will to be probated.

"The Court: What agreement? A. Well, I presumed that she meant the agreement between my dad and I that I was to have one-third and the boys were to have one-third. I took it to mean that, because I was speaking about the will, and said I was surprised that no mention had been made of us, or

me. And that I could go back to California, back to Mill Valley, and she would send our share to us. That was all the conversation."

The cross-examination does not shed further light upon the subject.

In corroboration of plaintiff's cause, W. J. Hartzell testifies that he had a conversation at one time with Smith, probably six months before the marriage of Smith with the present defendant, in which Smith said in effect that he felt toward the children as though they were his own babies, and that he proposed to care for them, and another time after the marriage, in which he said, quoting the testimony:

" 'Bess, of course, is trying to make her own way now, but I have to help her all the time,' and he says, 'I think I will have to arrange a home for them somewhere. But,' he says, 'I expect to take care of them, feel toward them as though they were my own boys, and shall always provide for them.' About that time there were two or three times he consulted with me about the possibility of finding a home more suitable for them, so that he could relieve Mrs. Smith of the care of them. * * * He always repeated his extreme affection for the boys."

Mrs. Hartzell testifies that Smith said, after the divorce was granted, that he would not have insisted on her getting a divorce from the doctor if he had not intended to provide for her and the boys; that subsequent to the marriage of the present defendant Smith said that Bessie and Mrs. Smith were friends, and everything would be all right, and that Bessie and the boys were to be provided for just the same. And still later:

"He said he thought he would have to find another home for the boys, because children worried Mrs. Smith; that he intended to care for them all the same, whether their home was with him or somewhere else; that he intended 'to take care of them as though they were his own."

On cross-examination she further testifies that Mrs. Smith—

"said that she understood what P. B. had wished, and she intended to carry out his wishes regarding the boys. * * * It was very soon after his death."

Further than this, W. T. Price relates a conversation which he had with Smith after his marriage to the defendant, and while plaintiff was living with Price, her second husband, in which Smith said:

"Bess and the children are well provided for. * * * I want to see that the boys have a good education and means to go into any business that seems best for them to when the time comes. If I live, I shall see that it is done, and, if not, they are well provided for."

In refutation of plaintiff's proofs, the defendant denies utterly that she had any such conversation with plaintiff as she relates, while plaintiff and her husband, Price, were on their visit to Minneapolis after the death of Smith, or that she at any time agreed to carry into effect in any respect the alleged modified agreement which plaintiff claims she had with Smith; and she denies making any remark to Mrs. Hartzell to the effect that she understood Smith's wishes were such that she had any care or responsibility, either financially or morally, of the plaintiff or the children, and denies any recollection of ever having had any such conversation with Mrs. Hartzell as she relates. The defendant states, however, that at the time of plaintiff's visit she gave her

(plaintiff) money with which to bear her and her husband's expenses back to California.

It developed soon after Smith's marriage with defendant that plaintiff had not been managing the household to the satisfaction of Smith, that she had been extravagant, and that she had, prior to her divorce from MacLean, sent him money unknown to Smith, which annoyed and worried Smith greatly. Subsequent to the marriage, there was an effort to find a place where plaintiff and her children could stay; it being understood that Smith would bear their expenses. Such an arrangement was not consummated, and plaintiff went on the stage, very much against Smith's wishes, and her children were in the meantime maintained at his home. Plaintiff remained on the stage for some time, when again the separate maintenance of herself and the children came up, which finally resulted in Smith sending for plaintiff's own father, and it was arranged that plaintiff and her children should go to the Pacific Coast, that her father would contribute to their maintenance the sum of $50 per month, and that Smith would contribute a like amount. Her father failed in his promise, and Smith contributed the entire amount up to the time of plaintiff's marriage to Price, when he reduced his advancements to $50 per month for the use of the children. Later he advanced to plaintiff and her husband $2,000 with which to construct a residence, and at that time he discontinued all allowances for the support of plaintiff and the children.

As evidence of his solicitude for plaintiff and the children, and as indicative of his feeling towards her and of the manner in which she had treated him, is his letter to E. A. Wright, an uncle of plaintiff by marriage, in an endeavor to secure a home for plaintiff and her children, written February 16, 1903, less than a year after his marriage to defendant. He says:

"Herewith please find a letter from Bess, which indicates that she is cured of her stage folly, and it now becomes a question what to do with and for her and her children. The way she has treated me I can hardly be expected to take her back into my home again, and yet I want to do all I can to enable her to live properly and bring up the children as they should be brought up. Bess has absolutely no idea of the value of money; neither has she any sense of obligation, or even honesty, so far as money is concerned; but she has many good impulses, and she dearly loves the children, and wants to have them, and she has certainly shown good judgment in discipline of the children."

The letter culminates in an offer of $85 per month to Wright to take plaintiff and children and give them a home. Wright was not able to comply with the request, and then came the arrangement with plaintiff's father as above noticed.

In conformity with the tone of this letter is the conversation Smith had with Mr. and Mrs. Lauderdale, which took place some time after his marriage to defendant. He said to them:

"I think you know the family well enough, and know me well enough, to know that I have done everything that I possibly could for Bess, and for the children, and it has got to the point where I must draw a halt. * * * She has told different parties in regard to what I was doing and what I was not doing, and it certainly is not fair to me that she should circulate those stories, and I have no defense at all. The whole gist of the matter is that I am going to stop; I am not going to do anything more for them. As long as the chil-

dren are in my house, I will take care of them; but further than that I must absolutely stop."

Smith was very much wrought up over the situation.

As it relates to the alleged agreement and modified agreement with Smith to leave his property to plaintiff, the testimony of Mrs. Jessie Carey Smith is pertinent. She relates, in effect, that she had a conversation with plaintiff after the will was probated, in which plaintiff told her that she was very much disappointed at the way things had been left, to which witness replied, "I don't suppose you expected P. B. to leave you anything," and she answered that she thought he might have remembered the boys in his will, but at no time did. she say anything about claiming any contract for a will. Witness further says:

"I had a talk with her about why P. B. didn't adopt her. * * * She said that her mother hadn't wanted P. B. to adopt her, because her own father had mining interests which they hoped might develop into something worth while, and they thought he would be more favorably inclined to remember her generously if she were not the adopted child of another man."

Thus the relations of these parties are quite fairly indicated, and their feelings, motives, and disposition one towards the other. And now come the solemn acts of Peter B. Smith in the disposition of his property. It is everywhere agreed, and by all parties to the record, that Smith possessed a high sense of honor and integrity, was unusually careful and exact in all his business dealings, and fulfilled his obligations, whatsoever their character, punctiliously and to the very letter. On the very day of his marriage to defendant he made his first will. This was some seven or eight months only after it is alleged that he entered into the agreement to leave everything to the plaintiff. This circumstance is in strong refutation of the plaintiff's testimony respecting the alleged first agreement. Considering Smith's sense of honor, and his faithfulness in observing his obligations, it seems hardly probable that he would have made such a will in disregard of such an agreement.

When he made the second will, circumstances had greatly changed. Plaintiff had remarried, and had a home of her own, and her husband, Price, had duly adopted her two children, and in the meantime Smith had expended a large amount of money in the support of plaintiff and her children away from his domicile, so that he evidently felt under no further obligation to provide for them out of his estate. Hence he gave his entire estate to the defendant, his present wife.

[3]. As it relates to the alleged trust arrangement with the defendant to carry into effect the alleged modified agreement of Smith to leave his property equally to plaintiff, her children, and the defendant, the plaintiff is flatly contradicted by the defendant, and the testimony of Jessie Carey Smith lends support to the defendant's testimony. Upon the whole, it is clear to my mind that the plaintiff has failed to establish either the alleged first, or the modified, agreement by such clear and convincing proof as is required for the substantiation of parol agreements of the kind. And as to the alleged trust agreement with the defendant, the clear preponderance of the evidence is against plain-

tiff's contention. I am waiving the question whether the trust agreement is of a character susceptible of enforcement at all.

For these reasons, plaintiff is not entitled to recover, and her complaint will be dismissed, with costs to the defendant.