(No. 23917.—

FREDERICK A. FIERKE, Appellant, *vs.* THE ELGIN CITY
BANKING COMPANY *et al.* Appellees.

*Opinion filed April 16, 1937.*

Arthur L. Paulson, and W. B. Morgan, for appellant.

Marcus J. Sternberg, for appellees.

Mr. Justice Wilson delivered the opinion of the court:

Frederick A. Fierke filed an amended bill of complaint in the circuit court of Kane county against the Elgin City Banking Company, as executor of, and trustee under, the last will and testament of John F. Fierke, deceased, Frank J. Fierke, a nephew of the decedent, and Mary Fierke, his wife, their two sons, and Edith Fierke, the wife of the complainant, to compel the specific performance of an alleged oral contract by the decedent to make a testamentary disposition of real and personal property to the complainant. Thereafter, the complainant added an amendment to his amended bill. General and specific demurrers interposed by the five defendants first named were sustained, the complainant elected to abide by his bill, as amended, and a decree was entered dismissing it for the want of equity. Upon appeal, this court reversed the decree and remanded the cause, with directions to overrule the demurrers. (*Fierke* v. *Elgin City Banking Co.* 359 Ill. 394.)

After the remandment, the defendants answered the amended bill of complaint. A replication was filed to the answer. Evidence was heard and a second decree rendered dismissing the bill for want of equity. From that decree the complainant prosecutes the present appeal.

On September 1, 1928, John F. Fierke was sixty-eight years of age, in failing health, and despondent over the recent death of his wife. He was then president of the Illinois Iron and Bolt Company and his nephew, the complainant, had been employed by the same company for twenty-two years doing clerical work. The senior Fierke owned a parcel of land improved by a pretentious brick residence, a garage and other buildings, in the village of West Dundee, in Kane county. At the time mentioned, Fierke was without the assistance or companionship of persons other than employees in his home. The complainant and Edith Fierke, then about thirty-five years of age, had been married two years and in March, 1928, had purchased a home in West Dundee for $11,000. By his amended bill the complainant alleged that under these circumstances John F. Fierke, on September 1, requested him to move into his, the uncle's, house, live there as a member of his family, be a companion to him, and assume the management of his home during the remainder of his life; that in consideration thereof, his uncle promised, at his death, to leave him, in fee simple, the real estate previously described and the contents of the house; that Fierke, the uncle, knew the complainant was a man of modest means and income, and to enable him to maintain the property, promised him, in addition, 1300 shares of stock in three corporations, and $10,000 in money; that on the fifteenth day of September, 1928, the complainant moved to his uncle's house; that he occupied the latter's premises with him as a member of his family, and assisted him in the management of his household until he departed this life on August 26, 1931; that his uncle died testate, leaving an estate valued at about $700,000,

and that the complainant, in all respects and at a sacrifice to himself, performed the agreement on his part, but that his uncle failed so to do. The allegations of the amendment to the amended bill are, that the complainant's wife resided with him in the home of John F. Fierke; that during the period of their residence there they performed many irksome and arduous duties without remuneration; that in consequence their health became greatly impaired, and in seeking restoration, the complainant incurred considerable expense; that the performance of the agreement was a great physical and financial detriment to him; that his services were rendered wholly in reliance upon the contract and that they were of such a nature that they could not be adequately compensated at law.

The last will and testament of John F. Fierke, deceased, executed on September 22, 1930, was admitted to record by the probate court of Kane county. By his will, Fierke devised and bequeathed to the Elgin City Banking Company, the property in controversy, upon the following trusts: To the complainant, for and during the period of his natural life, the. use and occupancy of the real estate and the income from the personal property, except that, in the event he and his wife had a child which attained the age of six months, the property specified should go to the complainant absolutely; if, however, he should die without a child having survived for the requisite period, the trustee was directed to pay $5000 to Edith Fierke, the complainant's wife, and to convey the real estate and transfer the remainder of the personal property to Frank J. Fierke, another nephew of the testator, if living, and in case of his death, to that nephew's heirs. The property devised and bequeathed in trust for the benefit of the complainant was the same real and personal property charged to have been covered by the alleged oral contract. By the residuary clause of his will the testator divided the remainder of his estate, after providing for the complainant and for two sisters of

his deceased wife, among thirty-one nephews, nieces, grand-nephews and grandnieces of himself and his late wife, expressly stating that "The said Frederick A. Fierke shall take nothing under this paragraph, as he has already been provided for in paragraph 5 hereof."

By their answer the defendants denied the material allegations of the amended bill of complaint. They answered further by averring that John F. Fierke requested the complainant and his wife to live with him, agreeing to pay Edith Fierke the sum of fifty ($50) dollars per month for services as housekeeper and to pay the living expenses of the couple while they resided in his home. The defendants also averred that Edith Fierke and the complainant were both compensated in accordance with the foregoing agreement.

It is agreed that the complainant and his wife moved to John F. Fierke's home during the month of September, 1928, conformably to an arrangement proposed by the complainant's uncle. Evidence concerning the nature of the agreement is, however, conflicting. Proof of the existence of the oral contract alleged by the complainant rests solely upon the testimony of his wife, Edith Fierke. According to her testimony she was present at a conversation between her husband and his uncle about September 1, 1928, in his bed-room in which Fierke stated "he would like to have a blood relative come and live with him as a member of his family, to help him manage the household and to furnish companionship for him the rest of his life. He said that Frederick and I were the most suitable for this. He said that he was too weak and tired with his sick heart to talk any longer that evening and would like to have us go home and think it over." Edith Fierke further testified that about two days later John F. Fierke again summoned her husband and herself to the same room, where he was still in bed, and declared "he was willing to Frederick his home out-right, and plenty of money and stock to take care of his home without its being any burden upon him

[Frederick, the nephew,] if he would come and live with him the rest of his life and help manage his household and share companionship with him." The money and stock referred to in this conversation, the witness continued, were $10,000 in cash, all the Elgin City Banking Company stock then owned by John F. Fierke, a "certain amount" of Illinois Iron and Bolt Company stock and 200 shares of Deere and Company stock. The par value of the securities was $39,000 at that time. Mrs. Fierke stated that her husband accepted his uncle's offer at this second conference. She also testified that it was agreed that she would assist her husband with the management of the household and share companionship with Fierke.

Three letters of John F. Fierke written in September and early October, 1928, are relied upon by the complainant to corroborate Edith Fierke's testimony concerning the existence of the challenged contract. In a letter to relatives of his deceased wife, dated September 15, 1928, he wrote: "Have not made much headway about carrying on our affairs since you left, but we settled one question, and that is, Frederick and his wife have come here to live with me. That will be nicer for the girls because Madie has plenty to do on the place where they are and they can always stay there. Fred and his, on the other hand, will be located permanently, too." In a letter to a close friend, dated September 25, 1928, he wrote: "After careful consideration on all sides, including some of my best friends, I concluded to take over Fred'k Fierke and his wife. You will remember him as my brother's youngest son who works in the office, Star Dept. His wife is a very pleasant young lady, loves housework and we have been real good friends ever since they were married two years ago." In a third letter, dated October 5, 1928, to another friend, he wrote: "For the last four or five days, have been taken for a ride by Frederick. * * * Mrs. Frederick took me out riding a few moments ago and I have always known that she is

an excellent driver. She hasn't much time for that now since has taken over the care of this abode."

Other pertinent facts and circumstances appear from the record. The complainant and his wife lived in John F. Fierke's home until November 2, 1928, when the uncle, according to his custom, went to Florida to spend the winter. From Edith Fierke's testimony it appears that before leaving for the south, John F. Fierke informed August Everett, the caretaker, that the witness was to manage the household, to be in charge of the premises, and to give orders. The complainant and his wife occupied their own home during this first winter, returning to the uncle's house in early April, 1929, where they have since remained. Mrs. Fierke testified that they assisted in renovating the house preceding John F. Fierke's return from Florida about April 15. At this particular time there was no caretaker on the premises. About May 1, 1929, Irwin Mertens, a brother-in-law of Edith Fierke, was employed to succeed Everett. He performed such services as tending the furnace, general yard work which included mowing the lawn, cleaning the sidewalks, taking care of the garden and garage, all, according to Mrs. Fierke, under her supervision with the assistance of John F. Fierke. It appears that Fierke made his annual trips to Florida in 1929 and 1930, in both instances remaining until the spring of the following year. A nurse and his two sisters-in-law, one of whom was his confidential secretary, accompanied Fierke on his trips to Florida. So far as the record discloses, neither the complainant nor his wife accompanied Fierke on any of his three southern sojourns during the time they resided with him. After moving permanently into the uncle's home the complainant rented his own house at rentals varying from $30 to $40 per month, with the exception of several periods when it was vacant.

Not only the complainant and his wife but also the caretaker and his wife, one or more nurses, and the ser-

vants, resided on the uncle's premises. The caretaker and his wife, Bertha Mertens, a sister of Edith Fierke, occupied the garage apartment. Mrs. Fierke testified that she was allowed to employ her sister when extra household help was required. Mertens and his wife still resided on the premises at the time of the trial, more than five years after John F. Fierke's death. Describing her own duties Mrs. Fierke testified that she managed the household, performed much of the manual work, and also relieved nurses on their hours off. In particular, she stated that besides assuming charge of the household her duties included the management of the caretaker, the cooking, baking, washing and ironing. Mrs. Fierke also said that she prepared meals for the nurses and visitors, as well as the family, and sometimes prepared special meals for the patient. She added that when she went to live at John F. Fierke's house she was in good health and weighed about 150 pounds; that when he died she was quite run down and weighed 125 pounds. This change in health and reduction in weight she attributed to the constant care of a large establishment and assistance with the care of the invalid. The witness said that on six or seven occasions she consulted a physician in Elgin who prescribed for her and that she obtained advice from Fierke's nurses.

From the record it also appears that Edith Fierke, prior to the death of John F. Fierke's wife, had assisted with the household work. For these services she received checks of $100 each in March and May, 1928, and two checks of $50 each in August of the same year. This money, she stated, was paid to her without any agreement for compensation. The personal account books of the deceased, however, described three of these checks as payments "for work during Gusta's sickness," "cleaning Apr. May," and "wages for July." Twelve checks for $50 each payable to Edith Fierke, dated after she and her husband moved into the uncle's home, were admitted in evidence. The latter's per-

sonal account books showed sixteen entries of disbursements of $50 each to Edith Fierke, one of which was termed a payment for "work;" three were designated payments for "housekeeping;" two, "wages;" three, "housekeeper;" five, "wages" for specified months; one, "Sept. serv.," and, one simply, "for June." The decedent's description of the payments made to Bertha Mertens between June 1, 1929, and August 1, 1931, likewise merits mention. Payments ranging from $6 to $35 were characterized as "wages" for different months, "helping housekeeper," "ass't housekeeping," "ass't housekeeper," and "help Edith F." Mrs. Fierke's explanation of the payments to her was that in the spring of 1929 John F. Fierke expressed the opinion that he had placed a heavier burden upon her than he had anticipated and accordingly desired to provide her with a little "pin money." She stated that she did not understand she was receiving anything for housekeeping. On September 25, 1931, Mrs. Fierke filed a claim in the probate court of Kane county against the estate of John F. Fierke, deceased, for $50 which she charged was the sum due her for services rendered as housekeeper for the month of August, 1931. The executor paid her claim on September 29. The complainant, her husband, instituted this litigation on June 26, 1933, nearly two years after his uncle's death and likewise after the filing and allowance of his wife's wage claim.

Edith Fierke described the services rendered by the complainant pursuant to the asserted agreement. Her husband, she related, performed most of his uncle's business errands, helped wait upon him, and also helped oversee and direct the caretaker. It appears further that he had access to his uncle's safety deposit box, and that he withdrew and replaced papers, made bank deposits for his uncle, and attended to like matters. The complainant's wife admitted, however, that the rendition of the services enumerated did not interfere with her husband's usual employment. Furthermore, the complainant was re-imbursed for all house-

hold and maintenance expenses advanced by him in behalf of his uncle. He did not, however, receive any monetary consideration for such personal services as he.may have performed for his uncle during the three years in question. The complainant's wife related that about a year after she and her husband went to live with the latter's uncle, her husband asked him what he should do with the home property willed to him if the securities bequeathed to take care of it should prove inadequate, and that the elder Fierke replied that if such a contingency should occur his nephew would have to do the next best thing, namely, sell the property. Fierke did not execute his will until September 22, 1930, more than a year after the conversation recounted.

The nurse, Bertha Kagel, was living in Fierke's home as a member of his household when the complainant and his wife moved there. She had attended Augusta Fierke, the deceased wife of John F. Fierke, from February, 1928, until her death the following summer. Thereafter, she attended Fierke until his death. She testified that she was with him almost constantly during the three years intervening between the death of his wife and his own death, that she went with him to Florida and, locally, to Elgin, and on business trips. Other nurses relieved her when she was indisposed and, during the last month of Fierke's life, a night nurse was employed. No one else attended Fierke, the witness declared, in the capacity of a nurse. She also testified that she and other nurses rubbed the patient and massaged his limbs, and that the complainant did not rub or massage the patient when she was in the house. Miss Kagel testified further that her employer referred to Edith Fierke as his housekeeper, and that Mrs. Fierke did the housework and the cooking, with the assistance of other persons whom she called in about twice a week. Referring to the complainant, she added, "I don't know as to anything special he did in the house," and that, although he did transact some business for his uncle the first year, the latter

apparently relied upon his secretary in most business matters. Edith Fierke, recalled as a witness, testified that she and her husband rubbed and massaged John F. Fierke at times when the nurses were off duty.

It was stipulated that during the administration of the trust created by Fierke's will, $2319 had been received by the trustee in dividends and that as of November 12, 1935, there was a balance of $1067.13, being the difference between receipts and expenditures in connection with the real estate involved in this litigation.

The complainant, to obtain a reversal, contends that the evidence narrated sustains the material allegations of his bill, as amended, and that therefore a decree should have been entered in conformity with the prayer of his complaint. To sustain the decree, the defendants maintain that the agreement under which the complainant and his wife moved to his uncle's house was, that Edith Fierke should do the housekeeping and receive $50 per month therefor, that her husband was to live there with her, and that John F. Fierke would pay their living expenses and all incidental expenses in connection with his home. In passing upon the sufficiency of the complainant's pleading upon the former appeal, this court said: "The allegations, which under demurrer must be taken as true, show that in reliance upon decedent's promise, complainant gave up his own home, carried out his part of the agreement without compensation, and that he and his wife performed services over a period of practically three years which impaired their health. They sufficiently show that by reason of the contract complainant made a change by which he suffered a substantial detriment, financially and physically." To entitle the complainant to the relief sought it was therefore essential to establish not only the existence of the challenged contract but also that he and his wife performed their part of the alleged agreement without remuneration; that the rendition of services impaired their health, and, fur-

ther, that performance of the agreement in controversy resulted in a substantial detriment both financially and physically to the complainant.

The granting of the equitable remedy of specific performance is a matter of sound, judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of the particular case. (*Holsz* v. *Stephen,* 362 Ill. 527; *Johnson* v. *Gianacakos,* 356 id. 410; *Yager* v. *Lyon,* 337 id. 271.) Rendition of personal services, the value of which may be pecuniarily estimated, or which can be adequately compensated at law, will not remove an oral contract to devise land in exchange for such services from the operation of the Statute of Frauds. (Pomeroy on Specific Performance, (3d ed.) sec. 114; *Rath* v. *Degener,* 352 Ill. 135; *Winkelmann* v. *Winkelmann,* 345 id. 566; *Edwards* v. *Brown,* 308 id. 350.) It is only where the Statute of Limitations may be invoked to bar a recovery at law, or where the improvements made or the services performed by the promisee are of such a peculiar character that he cannot be adequately compensated at law, or where a failure to carry out the agreement will amount to a fraud on the promisee, that specific performance will be decreed. (*Holsz* v. *Stephen, supra; Flannery* v. *Woolverton,* 329 Ill. 424; *Fletcher* v. *Osborn,* 282 id. 143; *Dalby* v. *Maxfield,* 244 id. 214; *Warren* v. *Warren,* 105 id. 568.) Courts of equity grant relief in such cases on the theory that the parties cannot be placed in *statu quo* or damages awarded which would be full compensation and that it is therefore unjust and inequitable to permit the contract to remain unexecuted. (*Gladville* v. *McDole,* 247 Ill. 34.) It necessarily follows, where the promisee shows no substantial change for the worse in his position resultant from the agreement, relief will be denied. *Fierke* v. *Elgin City Banking Co. supra; Edwards* v. *Brown, supra.*

The existence of a contract to support this suit is based wholly on the testimony of the complainant's wife. Evi-

dence of admissions made by a person since dead must be carefully scrutinized and the circumstances under which they were alleged to have been made considered with all the evidence in the case. (*Moreen* v. *Estate of Carlson,* 365 Ill. 482.) The complainant argues that his wife's testimony concerning the contract and its terms is substantiated by other evidence. Recourse to the evidence discloses that the complainant and his wife moved from his home to his uncle's house and lived there approximately three years. The nurse, servants and the caretaker, or their successors, who were present when the complainant moved to his uncle's house in September, 1928, were retained by the latter until his death. There is no claim that the complainant made improvements upon the property during his occupancy. It affirmatively appears that the brother-in-law of Edith Fierke performed the usual duties of a caretaker under her supervision, and the assistance of the decedent. The nurse did not know of any service rendered by the complainant in the house. The only testimony even tending to show performance of an arduous or irksome duty was the testimony of complainant's wife that he occasionally rubbed and massaged his uncle. Her testimony in this regard was, however, in conflict with that of the nurse. Manifestly, the character of the assistance rendered by the complainant otherwise during the seven months of the year his uncle lived in West Dundee could hardly have been detrimental to him physically. Such services were certainly not of an extraordinary and exceptional character. The allegation that the performance of irksome and arduous duties impaired the health of the complainant and his wife is supported only by the testimony of the latter to the effect that she lost twenty-five pounds in weight from September, 1928, to August, 1931. The record is barren of testimony concerning the complainant's health during this period. Nor is there any testimony which might indicate that he incurred considerable expense in seeking to restore

the health of either his wife or himself. The complainant concedes, as the evidence abundantly discloses, that performance of the alleged agreement on his part was financially profitable to him. In particular, it appears (1) that John F. Fierke paid all the living expenses of the complainant and his wife while they resided with him or in his house, (2) that Edith Fierke received $50 per month during this period for her services as housekeeper, (3) that the complainant continued in the regular pursuit of his duties with the Illinois Iron and Bolt Company of which his uncle was president during this period, and (4) that he received rent for his own home during a large part of the time he resided in his uncle's house.

The letters of John F. Fierke upon which the complainant places reliance cannot avail him. In one letter the decedent stated that the complainant and his wife would be located permanently. By his will he singled out the complainant and provided that he should enjoy the use and occupancy of the homestead property during his life. In another letter the testator declared that he had discussed with friends the matter of bringing the complainant and wife into his home. None of these persons were called as witnesses by the complainant to testify to the arrangement made with his uncle. In a third letter Fierke stated that Edith Fierke was in charge of the homestead. This statement does not square with the allegation that Fierke requested the complainant, as well as his wife, to assume the management of his establishment during the remainder of his life. Again, Mrs. Fierke testified that the uncle informed the caretaker she was to manage the household, to supervise the property and to give orders. Fierke's household records disclose like expressions with respect to the payments made to Edith Fierke and her sister, Bertha Mertens, who was designated "assistant housekeeper." The letters, together with the decedent's personal account books and Edith Fierke's testimony, tend to prove the existence

of a different contract from the one alleged by complainant and, conversely, to confirm the contention of the defendants that Mrs. Fierke was selected by John F. Fierke to manage his household and supervise the caretaker, and that she was fully compensated.

It is insisted, however, that the sum of $50 paid monthly to Edith Fierke was merely "pin money." The argument falls when it is noted that after Fierke's death she promptly filed a claim for services as housekeeper for the last month of his life. This indicates that a different conception of her relationship to the decedent obtained at the time of Fierke's death than asserted upon the trial. Fierke's account books demonstrate that he considered the sum of $50 which he paid to Mrs. Fierke monthly was for her wages as his housekeeper. The position taken by her when she filed her claim for wages is inconsistent with her testimony that the sums paid to her were merely "pin money." *Moreen* v. *Estate of Carlson, supra.*

Direct disproof of declarations and admissions of a promisor and his conduct, in a proceeding for specific performance of an oral contract to devise and bequeath property, is rarely possible. In the present case, however, the promisor has spoken from the grave, not only by his letters and account books but also by his will, executed more than two years after the alleged oral agreement was entered into in 1928. Where an asserted oral contract is out of harmony and inconsistent with a will made by the promisor subsequent to the time when it is alleged that he entered into the contract in question, the will is entitled to be taken into consideration as bearing upon the improbability of the contract having been made as alleged. (106 A. L. R. 766; 69 id. 210; *Sieg* v. *Sendelbach,* 256 Mich. 456; *Price* v. *Wallace,* 242 Fed. 221, and 224 Fed. 576; *Makinson* v. *Shumick,* 196 Iowa, 980; *Holmes* v. *Connable,* 111 id. 298; *Lohse* v. *Spokane and Eastern Trust Co.* 170 Wash. 46; *Hinton* v. *Hinton's Executor,* 239 Ky. 664.) In *Price* v.

*Wallace,* 224 Fed. 576, the promisor disposed of his property by will in a manner inconsistent with the alleged contract. In holding that a contract to bequeath property was not established the court pointed out that the promisor possessed a high sense of honor and integrity, was unusually careful and exact in his business dealings, and fulfilled his obligations, whatsoever their character, punctiliously and to the letter. The court observed further that considering his sense of honor and his faithfulness in observing his obligations, it seemed hardly probable that he would have made a will in disregard of the agreement had it actually existed. These observations are particularly pertinent to the case at bar. By his letters, written at the time the complainant went to live with him, the decedent indicated that he proposed to make an arrangement by which the former could continue to reside there during his lifetime. By his will he made adequate provision for the complainant in this respect. It is not the function of a court of equity to frustrate the testator's intentions by making a new will for him when his generous desires violate no rule of law and are not against public policy.

A consideration of all the facts and circumstances in the present case impels us to refrain from substituting our judgment for the chancellor's finding which is buttressed by the testimony of the witnesses whom he had the benefit of seeing and hearing. It cannot be said that denial of the relief sought will perpetrate a fraud on the complainant. Such services as he may have performed for his uncle were rendered in the last three years preceding the day of the latter's death. No portion of the complainant's claim was barred by the Statute of Limitations and the value of his services performed could easily have been ascertained in dollars and cents. He thus had an adequate remedy at law for whatever services he may have rendered in the decedent's behalf by filing a claim therefor against his estate.

The decree of the circuit court is affirmed.

*Decree affirmed.*