(No. 26203.— )
GEORGE W. FAULKNER, Appellant, *vs.* BENJAMIN H. BLACK, Admr., *et al.* Appellees.

*Opinion filed November 18, 1941.*

PRESCOTT, BURROUGHS & TAYLOR, (A. MORRIS BURROUGHS, PATRICK B. PRESCOTT, JR., and ULYSSES S. KEYS, of counsel,) for appellant.

BLACK & BEERMAN, (BENJAMIN H. BLACK, of counsel,) for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

James A. Young, a widower, died intestate on February 6, 1940. Thereafter, the plaintiff, George W. Faulkner, filed an amended complaint in the circuit court of Cook county seeking specific performance of an alleged contract between Young and himself, by which the former agreed to devise to him an unencumbered, improved parcel of real estate in Chicago. Benjamin H. Black, administrator of the estate of James A. Young, deceased, the unknown heirs-at-law of the decedent, if any, unknown owners, and Irene Young Cook and her husband, were made parties defendant. Willio Cheno, conformably to leave granted, filed an intervening petition charging that he had rendered personal services to Young several years prior to the latter's death and that, in consideration therefor, Young had promised to leave the property mentioned to him. The intervenor sought specific performance of the alleged agreement. All defendants were defaulted, except the administrator, who answered the amended complaint and the intervening petition, denying their material allegations. The cause was referred to a master in chancery who heard considerable testimony and filed his report finding the issues against both the plaintiff and the intervenor. The chancellor approved the master's report and on November 6, 1940, rendered a decree dismissing the complaint and, also, the intervening petition for the want of equity. November 18, 1940, an order was entered (1) allowing fees to the receiver of the property and his attorney and (2) directing funds in the hands of the receiver to be turned over to the administrator, subject to the order of the probate court of Cook county. Plaintiff prosecutes a direct appeal, a freehold being necessarily involved. The intervenor, Cheno, has not appealed.

James A. Young retired from his position as an employee of the United States Post-Office Department, at Chi-

cago, on September 1, 1932. Subsequently, he received a retirement annuity of $929.28, payable in monthly instalments. In 1936, he purchased a vacant lot generally known as 5838-5840 South State street for $3000 through George W. Faulkner and John Porcius Faulkner, partners, transacting business under the firm name and style of Faulkner & Company, and paid the usual commission. The plaintiff; George W. Faulkner, is the active head of the business. The company manages from twelve to fifteen buildings, leases and sells real estate, and employs four or five salesmen. It appears that Young had not previously been acquainted with plaintiff but had long known William E. Lyles, one of the company's salesmen. Young improved the property, at a cost of $5000, with a two-story brick building, the second floor consisting of an apartment of five rooms which he occupied until his death on February 6, 1940, at the age of seventy-seven years. The ground floor was rented to Lola Stovall, proprietress of a beauty parlor. Faulkner, or his company, collected the rents from Mrs. Stovall, the sole tenant, and received a fee therefor of five per cent. During the construction of the building and thereafter, Young consulted with plaintiff, and, apparently, was content to leave the character of the improvement largely to plaintiff's judgment. Upon completion of the improvement, plaintiff managed the property and, from time to time, caused repairs to be made. Plaintiff did not render personal services of any kind to Young, although the latter needed almost constant attention during the last days of his life. Indeed, it appears that plaintiff did not even visit Young during his last illness. Nor did he attend to funeral arrangements. On the other hand, for about three years prior to Young's death, Cheno lived in Young's building, at first in the boiler room in the basement and, later, occupied a room on second floor in the apartment. It is admitted that during these years Cheno nursed Young and performed services of a menial character. The master's

conclusion, approved by the court, that such services have either been compensated for during Young's lifetime or could be compensated in an action at law is not before us for review and our statement concerning the character of services rendered is made for the sole purpose of differentiating between such services as Faulkner rendered Young, if any, and those performed by Cheno.

Plaintiff rests his claim largely on an instrument which reads as follows:

"October 22nd, 1937.

Mr. Faulkner, Dear Sir:

I have no relation. You take care of me and my business. I will give my property.

JAMES A. YOUNG
5838 State Street."

By his complaint, plaintiff charged that placing reliance upon the foregoing instrument, in addition to collecting rents on a commission basis, he performed many irksome and arduous duties, without remuneration; that, in consequence, his meager finances became depleted and his health impaired. The defendant administrator challenged the genuineness of the signature to the quoted instrument. Several witnesses testified that in their opinion the signature was the genuine signature of Young. Of these, Lyles was eighty-five years of age and in feeble health, having suffered a stroke in June, 1939. Lyles, who had known Young for thirty years, testified that he had seen the deceased write his name about twenty times and could identify his signature. He stated that the signature on the challenged instrument was Young's signature, observing "I would know that anywhere." Henry W. Calhoun, an undertaker and funeral director, acquainted with Young for fourteen years and associated with him in numerous fraternal organizations, testified that he was familiar with Young's signature and expressed the opinion that the handwriting on the document, as well as the signature, was Young's handwriting. John Taitt, one of plaintiff's employees, testified that in

October, 1937, accompanied by Bowen, one of plaintiff's salesmen, he went to 5840 South State street to erect a "For sale" sign on behalf of his employer; that, in response to an invitation, Bowen went up to Young's apartment and brought back an envelope Young was sending plaintiff; that Bowen gave the envelope to plaintiff upon their return; that plaintiff opened, read and, smiling, pitched it back to Bowen; that Bowen read and handed it to the witness, and "we all three laughed about it." Taitt stated that the instrument in controversy resembled the paper Young sent to Faulkner. John Porcius Faulkner, plaintiff's brother and partner, stated that he was familiar with, and that the instrument bore, Young's signature. On the other hand, Rudolph B. Salmon, a handwriting expert, testifying in detail on behalf of the administrator, compared the instrument in controversy with nine other documents admittedly bearing Young's signature. Salmon expressed the opinion that the questioned letter was a tracing of Young's writing, made by some other person, and that after the tracing had been made the writer patched up the parts he considered defective and went over it for the purpose of correcting the errors made when the tracing was done. He concluded that the letter was a forgery of Young's signature and was not the writing of the person who wrote the other nine documents. The master found that from a casual examination of the document and a comparison with another written by Young on September 8, 1937, it was apparent without the aid of any instruments, that the memorandum dated October 22, 1937, was not written by the same person who wrote the document dated September 8, 1937. The decree sustained the master's finding that the document was not genuine; that, instead, it was a forgery and, hence, not entitled to any consideration.

Additional testimony adduced by plaintiff discloses that on several occasions Young expressed his satisfaction with plaintiff's management of his property and, also, his high regard for plaintiff. Calhoun related a conversation with

Young in which the latter said: "If anything should happen to me, Mr. Faulkner will take care of all my business." The witness recalled this particular conversation because it occurred on the second Monday night following the feast of Zurp. Again, when Calhoun brought Young home after a lodge meeting and declined Young's offer to remunerate him Young said: "I want to pay my way because the 'old man' won't be here much longer. * * * But if anything should ever happen to me Mr. Faulkner will take care of my business." Mrs. Stovall testified that the deceased, in a conversation in June, 1937, informed her that Faulkner was in charge of his affairs and "The people that were nice to him would be the ones that he would leave his property to. He didn't call any name at all." Lyles testified that at the time the plans for the building were under discussion Young said to Faulkner: "George, you look after this building. I leave it all to you." A short time afterwards, according to Lyles, Young made the following statements to Faulkner: "I would like to have you take charge of this building. I have nobody. And you have been very good to me, and I trusted you and found you O.K." "If anything should happen to me, George, you can have this place, because I have nobody to give it to," and "I am well satisfied with the way you have taken care of my property, and if anything should happen to me, George, I am going to fix it so you can have it." Lyles also testified that in October, 1937, he suggested that Young ought to give the property to him; that when Young declared he was going to give it to Faulkner, the witness pointed out that he had known Young much longer, and that Young then said: "No, you got all you want. I am going to give it to Mr. Faulkner." Lyles added that in the latter part of 1937 Young told him he had given the property to Faulkner; that he had no relatives, and knew no one he liked any better. In January, 1939, according to Lyles' testimony, Young requested Faulkner to visit him oftener, observing: "You don't come around so much;" that the latter replied:

"I am kind of busy," but if Young would call him when he needed assistance he would be ready to help him; that Young inquired if Faulkner had the paper he, Young, had given him and told him to "keep track" of it. The witness admitted: "I didn't know what he meant because there was no paper in sight." Horace B. Cooper, a retired postal employee, testified that about four months before Young's death the latter told him: "Faulkner is looking after everything, looking after the property. He is my agent," and, further: "I am depending on Faulkner, and if anything happens to me I expect Faulkner to look after everything." John Porcius Faulkner testified that in November, 1939, he inquired of Young who would look after his affairs in the event the latter died; that Young replied to the effect plaintiff had visited him whenever needed and that he had told plaintiff he could have his property at his death for what he had done for him, adding: "I have given him a statement to that effect."

Plaintiff contends that the proof sustains the material allegations of his complaint and that the decree should have granted him the relief sought. The defendant administrator maintains that the evidence is insufficient to establish the existence of a contract, written or oral, between plaintiff and Young; that if there was an oral contract it violated the Statute of Frauds, and that the proof is insufficient to take the contract out of the statute. The legal principles applicable to the facts recounted are firmly established. The granting of the equitable remedy of specific performance is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances in the particular case. (*Fierke* v. *Elgin City Banking Co.* 366 Ill. 66.) To justify a decree of specific performance of an oral contract for the conveyance of land the proof must be clear and conclusive of its existence and terms. (*Mayo* v. *Mayo,* 302 Ill. 584; *Aldrich* v. *Aldrich,* 287 id. 213; *Fletcher* v. *Osborn,* 282 id. 143; *Willis* v. *Zorger,* 258 id. 574.) Ren-

dition of personal services, the value of which may be pecuniarily estimated, or which can be adequately compensated at law will not remove an oral contract to devise land in exchange for such services from the operation of the Statute of Frauds. (*Fierke* v. *Elgin City Banking Co. supra;* *Edwards* v. *Brown,* 308 Ill. 350.) Again, where the promisee shows no substantial change for the worse in his position resultant from the agreement, relief will be denied. *Fierke* v. *Elgin City Banking Co. supra;* also, 359 Ill. 394.

Plaintiff's reliance upon the instrument bearing the purported signature of Young cannot avail him. A further review of the testimony with respect to the genuineness of the signature is unnecessary. Admittedly, none of plaintiff's witnesses saw Young write the memorandum. Our examination of the original document, as well as other specimens of Young's handwriting, discloses that the document dated October 22, 1937, does not bear the same signature as do the other documents which admittedly were signed by Young. It is true, as plaintiff points out, that the witness Salmon was a so-called expert. This fact goes to the weight of his testimony rather than to its credibility. Moreover, section 1 of "An act concerning proof of handwriting and to permit proof of handwriting to be made by comparison," (Ill. Rev. Stat. 1941, chap. 51, par. 50, p. 1655,) ordains: "That in all courts of this State it shall be lawful to prove handwriting by comparison made by the witness or jury with writings properly in the files or records of the case, admitted in evidence or treated as genuine or admitted to be genuine, by the party against whom the evidence is offered, or proved to be genuine to the satisfaction of the court." It suffices to observe that the evidence abundantly sustains the finding of the master and the decree of the chancellor that the signature "James A. Young" is a forgery.

Apart from the point made by the administrator that the writing, even if genuine, does not constitute a contract, plaintiff's claim is dependent upon the proof of an oral

contract. Plaintiff insists that the evidence discloses an oral agreement without recourse to the challenged document. The testimony narrated is far from sufficient to prove the existence of an oral contract to convey or devise real estate. Proof of its existence and terms is neither clear nor conclusive. Construing the evidence most favorably to plaintiff, it is not enough that Young may have wanted him to take the property after his death. With respect to the statements attributed to Young, we must again observe that evidence of admissions made by persons since dead must be carefully scrutinized and the circumstances under which they were alleged to have been made must be considered with all the evidence in the case. (*Fierke* v. *Elgin City Banking Co.* 366 Ill. 66; *Moreen* v. *Estate of Carlson,* 365 Ill. 482.) So far as the record discloses, plaintiff was not greatly discommoded by the services rendered Young. Indeed, it appears that he was compensated at the usual rate of remuneration for his services as a real estate broker. There is no showing that his finances were depleted nor that his health was impaired to the slightest degree. Such services as he may have performed for Young were rendered in the last four years preceding the latter's death. No portion of this claim was barred by the Statute of Limitations and the value of his services could easily have been determined in dollars and cents. An adequate remedy at law was thus available for services rendered in Young's behalf by filing a claim therefor against his estate.

Since plaintiff was not entitled to specific performance, he is not in a position to assail the disposition of the funds in the hands of the receiver of the property. Similarly, he cannot attack the fees allowed the receiver and his attorney.

The decree and the order of the circuit court of November 6 and 18, 1940, respectively, are affirmed.

*Decree and order affirmed.*